

Dana J. Bruce
Assistant United States Attorney
Dana.Bruce@usdoj.gov

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4842
MAIN: 410-209-4800
FAX: 410-962-9293

July 25, 2018

**VIA EMAIL**
Warren A. Brown, Esq.
The Law Offices of Warren A. Brown, P.A.
711 St. Paul Street
Baltimore, MD 21202
(410) 685-4900

    Re: United States v. Ryan Farace,
       Criminal No. CCB-18-018 (D. Md.)

Dear Counsel:

  This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Ryan Farace (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by August 14, 2018, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense(s) of Conviction

1. The Defendant agrees to plead guilty to Counts 1 and 6 of the Superseding Indictment, which charge the Defendant, respectively, with Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Alprazolam and Conspiracy to Commit Money Laundering, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 1956(h). The Defendant admits that the Defendant is, in fact, guilty of these offense(s) and will so advise the Court.

### Elements of the Offense(s)

2. The elements of the offense(s) to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

  a. <u>Count 1</u>. That on or about the time alleged in the Superseding Indictment, in the District of Maryland:

    (i) there existed an agreement between two or more persons to manufacture, distribute, and possess with intent to distribute alprazolam, a Schedule IV controlled substance;

Rev. May 2018          1

    (ii) the Defendant knew of this agreement; and,

    (iii) the Defendant knowingly and voluntarily participated in or became a part of this agreement.

  b. <u>Count 6</u>. That on or about the time alleged in the Superseding Indictment, in the District of Maryland:

    (i) the Defendant and at least one other person entered into an agreement;

    (ii) the purpose of the agreement was to conduct a financial transaction involving the proceeds of a specified unlawful activity with the intent to conceal or disguise the source, nature, location, ownership, or control of the proceeds of the unlawful activity;

    (iii) the Defendant knew that the funds involved in the financial transaction were the proceeds of some form of unlawful activity; and

    (iv) the Defendant knowingly and voluntarily joined in the agreement.

Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 21 U.S.C. § 846 | N/A | 5 years | 3 years, and a mandatory minimum of 1 year if any jail time is imposed | $250,000 | $100 |
| 6 | 18 U.S.C. § 1956(h) | N/A | 20 years | 3 years | $500,000 or 2x the value of the property involved, whichever is greater | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

      c.      Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.      Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

      a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

      b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense,

however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

   g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

   h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.  a.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable United States Sentencing Guidelines ("U.S.S.G.") is § 2S1.1(a)(1) because the Defendant committed the underlying offense, namely, conspiracy to manufacture, distribute, and possess with the intent to distribute narcotics in violation of 21 U.S.C. § 846, and the offense level for that offense can be determined.[1] Accordingly, the following guidelines apply:

(i) Pursuant to U.S.S.G. §§ 2S1.1(a)(1), and 2D1.1(a)(5), (c)(14), the base offense level is **12** because the Defendant manufactured, distributed, and possessed with the intent to distribute 80,000 or more units of a Schedule IV narcotic;

(ii) The offense level is increased by **2** levels pursuant to § 2D1.1(b)(7) because the Defendant distributed a controlled substance through mass marketing by means of an interactive computer service;

(iii) The offense level is increased by **2** levels pursuant § 2D1.1(b)(12) because the Defendant maintained a premises for the purpose of manufacturing and distributing a controlled substance.

(iv) The offense level is increased by **2** levels pursuant to § 2S1.1(b)(2)(B) because the Defendant will be convicted under 18 U.S.C. § 1956.

(v) The offense level is increased by **2** levels pursuant to § 2S1.1(b)(3) because the offense involved sophisticated laundering.

(vi) The offense level is increased by **4** levels pursuant to § 3B1.1(c) because the Defendant had an aggravating role in the offense, and specifically was an organizer and leader of extensive criminal activity involving at least five other participants, resulting in an **adjusted offense level of 24**.

(vii) This Office reserves the right to seek an upward departure of up to 24 months pursuant to U.S.S.G. §§ 5K2.21 to account for uncharged conduct the Defendant committed, including conduct related to access device fraud and aggravated identity theft. The Defendant reserves the right to oppose any upward departure.

b.  This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility

---

[1] Pursuant to U.S.S.G. § 3D1.2(c), and § 2S1.1 Application Note 6, Counts 1 and 6 are grouped together. Pursuant to U.S.S.G. § 3D1.3, the Count with the highest offense level, here Count 6, is used to determine the offense level of the group.

under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.  There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.  Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.  At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including but not limited to the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a.  The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

    b.  The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

(i) The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

(ii) This Office reserves the right to appeal any sentence below a statutory minimum; and

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11. a. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses, which the Defendant agrees is at least $5,665,000 in U.S. currency and 4000 Bitcoin.

b. Specifically, but without limitation on the government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities:

2303 Knox Avenue, Reisterstown, Maryland:

1. the residence located at 2303 Knox Avenue, Reisterstown, Maryland;

2. the 2010 Lincoln Navigator with vehicle identification number 5LMJJ2J56AEJ02388 seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638145);

3. the 2012 GMC Sierra with vehicle identification number 1GT125EG8CF149436 seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638151);

4. the $356,200.00 in U.S. currency seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-637916);

5. the $20,620.00 in U.S. currency seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-USP-000747);

6. the $2,676.00 in U.S. currency seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-637917);

7. the 1,040.1905 Bitcoin seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638816);

8. the 1,763.587678 Bitcoin Cash seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638860);

9. the 100.9949777 Bitcoin Gold seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639515);

10. the 9.915096343662 Monero seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639514);

11. the assorted televisions, valued at the time of seizure at approximately $26,000.00, seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638848);

12. the assorted electronic equipment, valued at the time of seizure at approximately $19,931.97, seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639487);

13. the assorted jewelry, valued at the time of seizure at approximately $14,723.00, seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639460);

14. the Adam Equipment Nimbus Electronic Scale, valued at the time of seizure at approximately $1,150.00, seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638840);

15. the 24K gold $50 American Buffalo Coin, seized from 2303 Knox Avenue, Reisterstown, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639416);

16925 York Road, Hereford, Maryland (Odin LLC):

16. the assorted electronic equipment, valued at the time of seizure at approximately $2,479,950.00, seized from Odin LLC, 16925 York Road, Hereford, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638482);

17. the assorted electronic equipment, valued at the time of seizure at approximately $53,563.86, seized Odin LLC, 16925 York Road, Hereford, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-639093);

18. the assorted electronic equipment, valued at the time of seizure at approximately $15,384.00, seized from Odin LLC, 16925 York Road, Hereford, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure (Asset ID No. 18-DEA-638624);

19. the assorted televisions, valued at the time of seizure at approximately $3,577.00, seized from Odin LLC, 16925 York Road, Hereford, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-638741);

3 William Court, Sparks, Maryland:

20. the $1,181,850.00 in U.S. Currency, seized 3 William Court, Sparks, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant (Asset ID No. 18-DEA-637914);

19621 Middletown Road, Freeland, Maryland:

21. the 77,285.81836727 DigiByte seized from 19621 Middletown Road, Freeland, Maryland, on January 16, 2018, pursuant to the execution of a federal search and seizure warrant at (Asset ID No. 18-DEA-639486);

Bank Accounts:

22. any and all contents of Bank of America Account #446019534260, including the $21,236.52 seized therefrom on January 16, 2018, pursuant to a federal seizure warrant (Asset ID No. 18-DEA-639250);

23. any and all contents of Bank of America Account #446031014904, including the $15,754.01 seized therefrom on January 16, 2018, pursuant to a federal seizure warrant (Asset ID No. 18-DEA-639254);

24. any and all contents of Wells Fargo Account #1719443507, including the $11,420.97 seized therefrom on January 16, 2018, pursuant to a federal seizure warrant (Asset ID No. 18-DEA-639287), and the check in the amount of $32,081.73 issued by Wells Fargo to close out the account or any proceeds therefrom;

25. any and all contents of Wells Fargo Account #6792810241, including the $9,049.58 seized therefrom on January 16, 2018, pursuant to a federal seizure warrant (Asset ID No. 18-DEA-639326);

26. any and all contents of Wells Fargo Account #1793015940, including the $5,513.70 seized therefrom on January 16, 2018, pursuant to a federal seizure warrant (Asset ID No. 18-DEA-639335);

HitBTC Account(s):

27. any and all assets, including fiat currency and digital currency, in any HitBTC account controlled by Ryan Farace, including the HitBTC account associated with the email address bonersaurus@protonmail.com, from which 111.12480754

Bitcoin were seized by the U.S. government, pursuant to the Defendant's written consent, on March 7, 2018, and which continues to contains the following:

| | |
|---|---|
| USDT (Tether) | 2.78 |
| BTG (Bitcoin Gold) | 9,193.42 |
| XRP (Ripple) | 1,146,240 |
| ZEC (Zcash) | 1 |
| XMR (Monero) | 7,655.16 |
| BCN (Bytecoin) | 6,153,800 |
| SBTC (Super BTC) | 352.2959 |
| XDN (DigitalNote) | 220,400 |

Other Accounts/Currencies:

28. any and all digital currencies received by the Defendant from customers on dark net markets;

29. any and all digital currencies sent by the Defendant to individual(s) he believed would be exchanging the digital currencies for fiat currency, including digital currency sent to members of law enforcement acting in an undercover capacity;

30. any and all digital currencies that are stored on any electronic device seized from 2303 Knox Avenue, 3 William Court, 16925 York Road, and 19621 Middletown Road;

31. any and all assets (e.g., fiat and digital currencies) stored in any online account controlled by the Defendant, including but not limited to any BitPay, Binance, Bitstamp.net, PayPal, and Tradesatoshi account(s).

c. The Defendant agrees to consent to the entry of orders of forfeiture for the property described in the two above subparagraphs and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

d. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

e. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil

or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Disposition of Property

12.   a.   The Defendant understands that items of contraband seized by the government in connection with this case will not be returned. Contraband includes: drugs; drug paraphernalia; counterfeit goods; stolen, counterfeit, or fraudulently obtained identification documents or access devices; personal identity information; personal or corporate financial information; personal health information; child pornography; and any other images, objects, or information that it is illegal for the Defendant to possess or that the Defendant did not have authority to possess whether in tangible or digital form. Electronics containing contraband shall be treated as contraband. The Defendant consents to the destruction of all contraband.

       b.   The Defendant further understands and agrees that, as a convicted felon, he will have no right to possess firearms, grenades, explosives, and destructive devices, either actually or constructively. The Defendant consequently waives and abandons all of his right, title, and interest in any firearms, explosives, destructive devices, grenades, and ammunition seized from him, including (i) the Smith & Wesson .357 Magnum with serial number CJL2267 seized from the Defendant's bedroom at 2303 Knox Avenue, and (ii) the Springfield XDM 9mm with serial number MG451990 seized from Odin LLC, 16925 York Road, and the Defendant waives and releases any claim that the Defendant might otherwise have made to these items in the future. The Defendant consents to the destruction of any such firearms, explosives, destructive devices, grenades, and ammunition and agrees to hold the United States, its agents and employees, harmless from any claims whatsoever in connection with the seizure, abandonment, disposition, and destruction thereof.

       c.   With respect to any other property seized by the government in this case, the Defendant agrees that he will notify this Office in writing no later than 3 business days before his sentencing of any specific items belonging to him that he wants returned. The Defendant agrees that, absent such notification, any property seized in this case, including any items seized from 2303 Knox Avenue, Reisterstown, Maryland, 16925 York Road, Hereford, Maryland, 3 William Court, Sparks, Maryland, and 19621 Middletown Road, Freeland, Maryland will be deemed abandoned and will be destroyed in accordance with the policies, practices, and procedures of the law enforcement agency having custody thereof

## Defendant's Conduct Prior to Sentencing and Breach

13.   a.   Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

       b.   If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence,

then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

14. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

15. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

By: _____
Dana J. Brusca
Zachary B. Stendig
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8-12-18
Date

_____
Ryan Farace
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8-12-18
Date

_____
Warren A. Brown, Esq.
Counsel for the Defendant

## ATTACHMENT A

### STIPULATION OF FACTS
*United States v. Ryan Farace*

The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts, through surveillance images and video, emails, trash pulls, witness testimony, subpoenaed records, and other admissible evidence, beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

### Background

1. The Controlled Substances Act governs the manufacture, distribution, and possession of controlled substances in the United States, including narcotics that are prescribed by physicians and other licensed health care providers. The Controlled Substances Act and its implementing regulations set forth which drugs and other substances are "controlled substances." Controlled substances are assigned to one of five schedules, Schedule I, II, III, IV, or V, depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

2. Alprazolam is a synthetic analgesic that is classified as a Schedule IV controlled substance. It is available in generic form, but is typically sold under the brand name "Xanax."

3. Bitcoin is a form of digital currency (that is, a currency with an electronic-sourced unit of value). Unlike fiat currencies, such as the United States Dollar, Bitcoin do not exist in any physical form. Bitcoin exist solely as entries on a publicly available electronic ledger that records all Bitcoin transactions ever conducted. Unlike most fiat currency, Bitcoin is not issued or controlled by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a decentralized, "peer-to-peer" network. Bitcoin is a convertible currency meaning that it has an equivalent value in fiat or conventional currency, and users can exchange it for fiat currency. The exchange rate for Bitcoin is not determined by any government or centralized entity, but rather floats on the open market.

4. A "dark-web marketplace" is a marketplace on the dark web that individuals can use to buy and sell narcotics, among other illegal things. Users of dark-web marketplaces typically use Bitcoin or other digital currency as the means of payment for their transactions.

\*   \*   \*

5. At all relevant times, the Defendant, Ryan Farace, and his co-conspirator, Robert Swain, were residents of Maryland.

6. From at least November 2013 continuing to in or about June 2016, Farace resided at 3 William Court, Sparks, Maryland, his parents' home, and from in or about June 2016 until his arrest in January 2018, Farace resided at 2303 Knox Avenue, Reisterstown, Maryland, a home to which he himself held the mortgage.

7.  Farace has no known medical education, qualifications, or licensing in the State of Maryland or elsewhere.

Conspiracy to Manufacture, Distribute, & Possess with the Intent to Distribute Alprazolam

8.  Beginning no later than November 2013 and continuing through at least in or around June 2017, Farace, knowingly and willfully, combined, conspired, confederated, and agreed with other persons to manufacture, distribute, and possess with the intent to distribute alprazolam.

9.  As further described below, it was part of the conspiracy that Farace used primarily one postal meter, #1013107, registered and paid for, first, with a reloadable Netspend card registered to D.H., and, later, with a reloadable Green Dot card registered to D.G., to ship via the U.S. mail over 3500 packages to recipients throughout the country.[2] These packages contained alprazolam pills.

10.  It was further part of the conspiracy that Farace, and his family members, manufactured the alprazolam pills in the basement of the Farace family home at 3 William Court. The manufacturing equipment Farace and his co-conspirators used included a large standalone pill press about the size of a vending-machine, table top pill presses, pill molds stamped with "Xanax," pill dye, and mixing and dusting equipment. Some of the manufacturing equipment that Farace he purchased through eBay accounts that he opened in the member names "hooktits" and "farac-ryan."

11.  It was further part of the conspiracy that Farace purchased loose alprazolam powder and filler ingredients (such as microcrystalline cellulose and lactose) that he used to manufacture his pills. In 2017, Farace sent samples of the loose alprazolam powder he received to drug laboratories for testing. At times, Farace used the email address willyburns123@hotmail.com and the alias "Randall Fabor" to communicate with the drug laboratories.

12.  In or about June 2017, the U.S. Customs and Border Protection Service seized a package of loose alprazolam powder that Farace had purchased. The package was addressed to "Robert Swain, 76 Cranbrook Road, Cockeysville, Maryland." On January 16, 2018, additional packages of suspected alprazolam powder addressed to "Robert Swain" were seized from a safe located in the basement of Farace's parents' home.[3] Moreover, in 2016 and 2017, investigators

---

[2] Farace believed that D.H. and D.G. were real people whose personal identifying information he was using to conceal his own use of the reloadable debit cards. Reloadable debit cards, including the Netspend card in the name of D.H. and the Green Dot card in the name of D.G., are access devices within the meaning of 18 U.S.C. § 1029(e)(1).

[3] These items have been sent to a laboratory for testing, but as yet no results have been received.

Rev. May 2018                                    15

seized from the trash at 3 William Court various white powders that contained alprazolam powder and other uncontrolled substances, which Farace had purchased.[4]

13.   As previously noted, it was part of the conspiracy that Farace distributed many of the alprazolam pills that he manufactured through the U.S. mail. Records from a third-party postage provider that leased meter #1013107 from the U.S. Postal Service, establish that the postal meter was registered on June 10, 2015, under the name D.H., with an address in Timonium, Maryland. Records further reflect that, initially, the credit card used to add money to the meter's account, so the user could generate postage, was a Netspend credit card ending in x1390. Later, a credit card ending in x1488, among others, was used to pay for the meter.

14.   The credit card ending in x1390 was issued by Bank of the Internet (BOI). BOI records reflect that this credit card was associated with a Netspend account established on May 12, 2015 in the name and using the birthdate and social security number of D.H. The BOI records further reflect that the primary owner of the account was D.H., and that the account was established at a Walmart located at 1 Frankel Way, Cockeysville, Maryland. Third-party records establish that the card was being reloaded at this same Cockeysville Walmart, among other locations.

15.   Surveillance images obtained from Walmart's security systems, among other things, confirm that it was in fact Farace who opened and used the credit card opened with the personal identifying information of D.H. Indeed, on January 16, 2018, pursuant to federal search and seizure warrants, law enforcement officers seized from Farace's home at 2303 Knox Avenue a fake driver's license in the name of D.H., but picturing Farace, and the Netspend card ending in x1390.

16.   The credit card ending in x1488 was issued by Green Dot Bank. Green Dot records reflect that the card was activated at the Cockeysville Walmart in August 2016 in the name and using the birthdate and social security number of D.G. Once again, as confirmed by surveillance images from Walmart, among other things, it was in fact Farace who used the Green Dot card ending in x1488. On January 16, 2018, law enforcement officers seized from Farace's home at 2303 Knox Avenue the Green Dot credit card ending in x1488 and seized from 3 William Court, Farce's parents' home, a fake driver's license in the name of D.G.

17.   Postal meter #1013107 was used to ship over 3500 packages between June 10, 2015 (the date it was registered to D.H.), and January 26, 2017 (the last date that the meter was used to pay for postage on a shipped package). Forty-nine of these packages were addressed to "Carlton Hall" at various addresses in Tennessee, including 26 packages addressed to "Carlton Hall" at a specific address in Memphis, TN (the "Tennessee Address"). Investigators in Tennessee obtained warrants to search two of the packages mailed to the Tennessee Address, both of which had return address "Online Emporium Inc." at an address in Parkville, MD. Each

---

[4] During the course of the conspiracy, Farace purchased, received, and possessed a number of other narcotics, including fentanyl.

of the packages contained 10,375 suspected alprazolam pills stamped with the "Xanax" brand name.[5]

18.     As observed by investigators, Farace often drove his 2010 Lincoln Navigator to post offices located in Baltimore County, Maryland to ship the packages of alprazolam. For example, on January 11, 2017, investigators observed Farace dropping off packages at a Maryland post office, which, upon later review, were determined to be from three postal meters: 0901000000150, 0901000000098,[6] and 1013107, which had return addresses for the "Online Emporium" at various locations in Maryland.

19.     From at least November 2013 until at least June 2017, Farace solicited orders for his alprazolam pills using the vendor name "Xanaxman" on various dark-web market places, including but not limited to Silk Road 2.0, Hansa, and Dark Heroes League.

20.     The Hansa dark net marketplace was seized by Dutch authorities in or about June 2017. At that time, law enforcement obtained information about Hansa's buyers and sellers. This data reflects that between May 2016 and March 2017 the Hansa vendor, "Xanaxman" shipped 629 orders totaling approximately 500,000 pills, for which he received about 194 Bitcoin. Although most of Xanaxman's customers provided Xanaxman with their shipping addresses via encrypted messages that law enforcement officers cannot decode, on six occasions "Xanaxman's" customers failed to do so. For each of these six "Xanaxman" customers, on or about the same date that "Xanaxman" confirmed on Hansa that the orders of alprazolam had been shipped, the transaction data for postal meter #1013017 indicates a package was shipped to the address provided by the Hansa customer.

21.     Records obtained for the Silk Road 2.0 dark net marketplace, which was seized by the FBI in November 2014, further reflect that "Xanaxman" established a vendor account on Silk Road 2.0 on or about December 2, 2013. These records further reflect that "Xanaxman" finalized or shipped approximately 1066 orders between December 2013 and November 2014 (totaling approximately 420,000 pills), and received about 941 Bitcoin therefore.

22.     Blockchain analysis and other techniques establish that, in all, wallets associated with Farace and/or "Xanaxman" received over 9,138 Bitcoin from addresses associated with dark-web marketplaces. Farace also confirmed in encrypted emails that he had "4000 plus bitcoin built up" and that he "[n]ever really traded" Bitcoin and has "zero experience making money trading btc."

23.     For the duration of the conspiracy set out in Count One of the Superseding Indictment, Farace had no appreciable source of lawfully earned income.

---

[5] Postal inspectors destroyed the pills without testing them.

[6] Around this time, Farace stopped using postal meter 1013107. He instead started using postal meters paid for through third-party providers that permit individuals to buy postage with Bitcoin.

## Money Laundering Conspiracy

24. From at least July 2015 until in or around February 2017, Farace knowingly combined, conspired, confederated, and agreed with Robert Swain and Co-Conspirator 1, among others, to conduct and attempt to conduct financial transactions having an effect on interstate commerce which involved the proceeds of specified unlawful activity — to wit, the proceeds that Farace obtained from the conspiracy to manufacture, distribute, and possess with the intent to distribute alprazolam in violation of 21 U.S.C. § 846 set out in Count One of the Superseding Indictment — while knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activating and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, in violation of 18 U.S.C. § 1596(a)(1)(B)(i).

25. Specifically, Farace used the pseudonyms "Penisbreath," "CaptainCum," "SargentSemen," and "WhaleScrotom," to contact Co-Conspirator 1 through dark web marketplaces and encrypted messages in order to exchange Bitcoin that Farace received as the proceeds of his drug trafficking for cash.

26. To place orders for cash, Farace transferred Bitcoins to Co-Conspirator 1. Co-Conspirator 1 then mailed or shipped packages of U.S. currency equivalent to the value of the Bitcoin received, less a fee, to mailing addresses located in Maryland that were provided to Co-Conspirator 1 by Farace. Farace used pseudonyms and dark-web marketplaces when contacting Co-Conspirator 1 so as to conceal his true identity.

27. In or about July 2015, Farace opened a post office box at the Cockeysville, Maryland post office in the fake name of "Randy Fabor."[7] He did so in order to conceal and disguise that it was, in fact, Farace who was receiving packages of U.S. currency from Co-Conspirator 1.

28. In or about November and December 2015, three packages of U.S. currency sent by Co-Conspirator 1 to Farace were intercepted and seized by law enforcement, including two packages of currency sent by Co-Conspirator 1 to Farace at the "Randy Fabor" post office box.

29. Farace subsequently asked a co-conspirator, Swain, to open in Swain's name post office boxes and private rental mailboxes so that Farace could conceal the fact that he was continuing to receive packages of currency from Co-Conspirator 1. At Farace's request, Swain authorized "Randy Fabor," a fake alias used by Farace, to receive mail at the mailboxes opened up by Swain. In all, Swain opened at least one postal mailbox (on or about December 3, 2015), and two private rental mailboxes (on or about December 5, 2015, and October 7, 2016) for Farace. Farace thereafter received packages of cash from Co-Conspirator 1, addressed to "Randy Fabor" and "Robert Swain," at these rental locations. Swain knew that Farace was receiving packages of currency at the mailboxes Swain had opened, and Swain also knew that

---

[7] On January 16, 2018, law enforcement officers seized a fake driver's license picturing Farace but reflecting the name "Randy Fabor" from Farace's home at 2303 Knox Avenue.

the currency Farace received was the proceeds of Farace's drug trafficking.[8] During the course of the money laundering conspiracy, Farace received through the mails at least $5,015,000 in U.S. currency, which he had exchanged for Bitcoin earned from drug trafficking.

30. On or about February 16, 2017, Farace and Swain drove from Maryland to New Jersey so that Swain could collect $200,000 in U.S. currency that Farace had exchanged for Bitcoin earned from Farace's drug trafficking activities. During the in-person meeting on February 16, 2017, Swain provided a fictitious name to the individual he met and falsely stated that the Bitcoin and cash were his own. Farace and Swain took these measures to conceal and disguise the nature, location, source, ownership, and control of the drug trafficking proceeds.

31. Farace and Swain later attempted to exchange with the same individual Bitcoin that Farace had earned from drug trafficking for $400,000 in U.S. currency. However, this second attempt was unsuccessful

32. Farace invested some of the cash proceeds he received as a result of his drug trafficking and money laundering activities in Hope's Horizon, LLC, a drug rehabilitation facility located in Baltimore County, Maryland. He did so by providing the registered owner of Hope's Horizon, Pietro Sorrentino, with bundles of cash that Sorrentino subsequently caused to be structured into various bank accounts that Sorrentino owned and controlled. Sorrentino engaged in these structured deposits with the knowledge that the cash Farace gave him was drug proceeds, and with the intent to conceal and disguise the nature, location, source, ownership, and control of the funds. Additionally, in or about May 2017, Farace began receiving bi-weekly deposits from Hope's Horizon, LLC as purported "salary." In fact, Farace was not an employee of Hope's Horizon; rather, he received the money in an effort to have a source of income that appeared "legitimate."

SO STIPULATED:

_____
Dana J. Brusca
Zachary B. Stendig
Assistant United States Attorneys

_____
Ryan Farace
Defendant

_____
Warren A. Brown, Esq.
Counsel for Defendant

---

[8] Swain also knew that Farace was receiving controlled substances at the rental mailboxes.